OFICINA DE ÉTICA GUBERNAMENTAL y DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR, recurridos, *v.* CARMENISA D. RIVERA SANTOS y BETHZAIDA CINTRÓN LORENZO, peticionarias.

*Números:* CC-2000-744      *Resueltos:* 12 de enero de 2001
AC-2000-66

*Héctor Santiago Rivera*, abogado de Carmenisa Rivera Santos, peticionaria; *Gretchen Camacho Rossy* y *Wanda Torres Velázquez*, abogadas de la Oficina de Ética Gubernamental, recurrida; *Bethzaida Cintrón Lorenzo, pro se*, peticionaria.

I

PER CURIAM: El *8 de septiembre de 2000* la peticionaria, Carmenisa D. Rivera Santos, presentó un recurso de *certiorari* ante este Tribunal, al cual se le asignó el caso Núm. CC-2000-744; *Oficina de Ética Gubernamental v. Carmenisa D. Rivera Santos.* En dicho recurso nos solicita la revisión de una resolución emitida por el Tribunal de Circuito de Apelaciones (en adelante el Tribunal de Circuito) el 31 de julio de 2000 y archivada en autos, mediante copia de su notificación, el *8 de agosto de 2000.*([1]) Como parte del expediente, la señora Rivera Santos acompañó una moción en la que informó que el recurso ante este Tribunal debió ser presentado el 7 de septiembre de 2000. Adujo que a esa fecha lo único que le faltaba era incorporar los apéndices que se estaban fotocopiando en el negocio Post Net. Sin embargo, debido a la emergencia surgida en el sistema eléctrico, el 7 de septiembre, al Post Net le fue imposible entregarle los apéndices reproducidos. Alegó que al ser dicha avería una situación de fuerza mayor se le debía permitir presentar el recurso un día más tarde, el 8 de septiembre.

De otra parte, también el *8 de septiembre,* la Lcda. Bethzaida Cintrón Lorenzo presentó ante este Tribunal un recurso de apelación al cual se le asignó el Núm. AC-2000-66, *Bethzaida Cintrón Lorenzo v. DACO.*([2]) En esencia, cuestionó la determinación del Tribunal de Circuito de desestimar un recurso de revisión administrativa por craso incumplimiento con su reglamento. Esta resolución fue no-

---

([1]) En dicho recurso la señora Rivera Santos alega que la interpretación del Art. 3.3(B) de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 1823, hecha por la Oficina de Ética Gubernamental es una tan amplia que viola el principio de legalidad dispuesto en el Art. 8 del Código Penal, 33 L.P.R.A. sec. 3031. También sostiene que el esquema diseñado para adjudicar las querellas en dicha oficina es inconstitucional ya que viola el debido proceso de ley al no garantizar una adjudicación imparcial.

([2]) Acogemos el recurso Núm. AC-2000-66, como uno de *certiorari* por ser el apropiado.

tificada a las partes y archivada en autos copia de su notificación el 5 de julio de 2000. Oportunamente, es decir, el 20 de julio de 2000, la licenciada Cintrón Lorenzo presentó una solicitud de reconsideración. Ésta fue declarada sin lugar mediante Resolución de 4 agosto de 2000 y se archivó en autos su copia de la notificación el *8 de agosto de 2000.*

El 11 de septiembre de 2000, la licenciada Cintrón Lorenzo presentó una moción informativa, aduciendo que no pudo presentar el recurso el 7 de septiembre ya que ese día no hubo servicio de energía eléctrica, por lo que no pudo imprimirlo ni fotocopiarlo.

Como podemos observar, ambos recursos fueron presentados pasado el término jurisdiccional de treinta (30) días que establece la Sec. 4.7 de la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2177, y las Reglas del Reglamento del Tribunal Supremo de Puerto Rico de 1ro de mayo de 1996 (4 L.P.R.A. Ap. XXI-A). Sin embargo, ignorar que el 7 de septiembre de 2000 la zona norte de la isla, desde Fajardo hasta Arecibo, se vio afectada por un acontecimiento de fuerza mayor, por un caso fortuito, que no pudo ser previsto o que de ser previsto fue inevitable, sería no sólo ir en contra de las disposiciones legales pertinentes,[3] sino exigirle a las peticionarias lo imposible, aun cuando este Tribunal, en sus actuaciones reconoció que ese día sus labores no se pudieron llevar a cabo.[4]

Para propósitos de dilucidar el problema umbral de la supuesta falta de jurisdicción, hemos procedido a consolidar ambos recursos, exclusivamente en cuanto a este aspecto. Los planteamientos en los méritos continuarán dilucidándose individualmente en los casos.

---

[3] Véase Art. 1058 del Código Civil, 31 L.P.R.A. sec. 3022.

[4] El 7 de septiembre se despacharon la mayor parte de los empleados del Tribunal, debido a que la falta de servicio eléctrico les imposibilitaba realizar sus funciones.

## II

El jueves 7 de septiembre de 2000, la Autoridad de Energía Eléctrica (en adelante la Autoridad) emitió el siguiente comunicado de prensa relacionado con una avería causada por "la interrupción masiva del servicio de electricidad", en una línea de transmisión de doscientos treinta 230 KVA que afectó a la zona norte de la isla, de Arecibo a Fajardo:[5]

Alrededor de medio millón de clientes de la Autoridad de Energía Eléctrica se vieron privados del servicio de electricidad desde las 7:53 de esta mañana, cuando una de las líneas principales de transmisión salió de servicio, debido al impacto sufrido por árboles cercanos. Esta línea de transmisión, identificada como la 50,200, tiene una capacidad de 230 KV (kilovoltios) y discurre entre la Central Termoeléctrica de Costa Sur y Manatí. La salida de servicio de *dicha línea afectó mayormente la población de la franja comprendida entre Arecibo y Fajardo.*

La Oficina de Prensa de la AEE indicó que el patrullaje aéreo de la línea, que los helicópteros de la AEE realizaron a lo largo de las 35 millas de extensión de la misma, detectó la avería en la vecindad de Peñuelas. Posteriormente a este incidente, en torno a las 8:16 de la mañana, las líneas 37,000 (115 KV) y 50,300 (230 KV), mediante las cuales se distribuyó la generación de electricidad que debía transmitir la línea averiada, sufrieron desperfectos que las sacó de servicio, también. *La suma de estos incidentes provocó que la zona norte del país se viera desconectada, de la Central Aguirre, una de sus principales generadoras de electricidad y de la Central San Juan.* Durante esta emergencia se pudo sobrellevar la demanda de electricidad en el resto de la Isla debido a la aportación al sistema eléctrico de la cogeneradora privada EcoEléctrica y de la Central Termoeléctrica de la AEE en Costa Sur.

La Oficina de Prensa señaló la naturaleza del sistema eléctrico integrado de la AEE que se distingue por poseer unos dispositivos de seguridad que se activan automáticamente en caso de averías o de agresiones repentinas, como se ha evidenciado

---

[5] De esta forma calificó la Autoridad la interrupción ocurrida en el servicio de electricidad el 7 de septiembre de 2000. Comunicado de Prensa de la Autoridad de Energía Eléctrica de 14 de septiembre.

durante el paso de huracanes, fuertes ráfagas de lluvia y embates de árboles u objetos contundentes.

La AEE confía restablecer el servicio de electricidad a los clientes afectados alrededor de las 3 de la tarde de hoy. (Énfasis suplido.)

El 8 de septiembre la Autoridad emitió un segundo comunicado de prensa en el cual informó que el servicio de electricidad se restableció en un 100% a las 7:50 p.m. del jueves 7 de septiembre. Indicó, además, que esta situación no debería repetirse y nombró un comité técnico para investigar a fondo los detalles relacionados con el incidente.

El 14 de septiembre, la Autoridad emitió su último comunicado de prensa sobre este asunto. Entre las conclusiones principales el Comité técnico destacó las siguientes:

- *En la condición pre-disturbio el sistema se operaba dentro de los criterios normales.*
- Hubo averías genuinas y confirmadas de fase a tierra, tanto en la línea 50,200 como en la 50,300, ambas de 230 mil voltios de capacidad.
- No hubo problemas de estabilidad del voltaje.
- No hay indicios de problemas de inestabilidad de unidades generatrices. (Énfasis suplido.)

Como resultado de esta falla mayor en el sistema de energía eléctrica, en la Rama Judicial se afectaron, además del Tribunal Supremo, los siguientes centros judiciales: San Juan, Bayamón, Caguas y Arecibo.[6] En un sentido real y práctico estos centros judiciales no realizaron sus labores regulares, ya que sólo permanecieron abiertas algunas de las Salas de Investigaciones y ventanillas para la presentación de recursos y documentos. En el Tribunal Supremo sólo permaneció abierta la ventanilla de radica-

---

[6] En estos Centros Judiciales se tomaron las medidas siguientes: en San Juan, permaneció abierta para el público en general sólo la Sala de Investigaciones, donde también se recibieron documentos para presentación; en esta sala se atendieron casos del Centro Judicial de Bayamón. En relación con el Centro Judicial de Bayamón propiamente, los documentos para presentación tuvieron que recibirse en el Cuartel Municipal. De otra parte, en Arecibo un alguacil recibió los documentos para su presentación.

ciones con tres (3) personas para atenderla; el resto del personal se despachó por la imposibilidad de poder realizar trabajo alguno sin el servicio de energía eléctrica.

## III

■ Con relación a las obligaciones y a los sucesos imprevistos o inevitables, el Art. 1058 de Código Civil, 31 L.P.R.A. sec. 3022, nos dice que "nadie responderá de aquellos sucesos que no hubieran podido preverse, o que previstos, fueran inevitables". Para analizar esta disposición hemos utilizado los conceptos de *fuerza mayor* y *caso fortuito*.

■ Con relación a su contraparte, el Art. 1105 del Código Civil español, se ha expresado que éste "trata, sin nombrarlo, del 'caso fortuito' " y que "el término que más frecuentemente es utilizado en relación a él es el de 'fuerza mayor'…. El Art. 1105 recoge su definición tradicional como acontecimiento perjudicial y que excede absolutamente el concepto de diligencia". En cuanto a fuerza mayor, se ha dicho que es el acontecimiento, que "por su propia naturaleza excede *a priori* del concepto de diligencia; así que basta enunciarlo para saber que ante él toda diligencia hubiera sido irrelevante". F. Badosa Coll, *Comentario del Código Civil*, Madrid, Ed. Ministerio de Justicia, 1991, T. II, pág. 43.

■ En *Rivera v. Caribbean Home Const. Corp.*, 100 D.P.R. 106, 110 (1971), al hacer referencia al referido Art. 1058 del Código Civil expresamos que

> … ese suceso eximente de responsabilidad - por razón de que no puede preverse o que previsto no puede evitarse - se llama caso fortuito o fuerza mayor. *Este concepto amplio, que por estar basado en la equidad puede operar en todo campo de derecho, tiene como su aplicación más importante la de eximir de responsabilidad en el cumplimiento de las obligaciones.* (Énfasis suplido y escolio omitido.)

Como podrá observarse, este concepto de equidad apli-

cable a las obligaciones lo hemos interpretado de forma amplia, haciéndolo extensivo a todo el campo del derecho. Hoy estamos aplicando este sabio principio de equidad que permea todo nuestro ordenamiento a las normas procesales que, después de todo, tienen como único propósito el hacer viable la consecución de los derechos sustantivos.

■ Con relación a los conceptos de fuerza mayor y caso fortuito, a principio del siglo pasado, en *Vidal & Cía., S. en C., v. Am. R.R. Co.*, 28 D.P.R. 204, 210 (1920), hicimos constar que

> [f]uerza mayor es el acontecimiento que no hemos podido precaver ni resistir; como por ejemplo la caída de un rayo, el granizo, la inundación, el huracán, la irrupción de enemigos, el acontecimiento de ladrones ... y es caso fortuito el suceso inesperado o la fuerza mayor que no se puede precaver ni resistir ... [t]ales ... [como] las inundaciones, torrentes, naufragios, incendios, rayos, violencias, sediciones populares, ruinas de edificaciones causadas por alguna desgracia imprevista y otros acontecimientos semejantes.

## IV

En los casos ante nuestra consideración que versan sobre la aplicación de normas procesales, las cuales deben siempre ser interpretadas de forma tal que en todo procedimiento se haga justicia de manera justa, rápida y económica, ocurrió algo que no se podía prever y que no se podía evitar —una interrupción masiva del servicio de electricidad que afectó a toda la zona norte del país, la población de la franja comprendida, entre Arecibo y Fajardo. Esta interrupción masiva fue ocasionada por un corto circuito provocado en una línea de doscientos treinta (230) voltios al hacer ésta contacto con unos árboles debido a las condiciones de predisturbio que en esos momentos prevalecían en la isla. No nos cabe la menor duda que el 7 de septiembre la zona norte de la isla experimentó un acontecimiento que

por su naturaleza y magnitud era catalogable como de fuerza mayor o caso fortuito.

Las inclemencias del tiempo ocasionadas por condiciones de predisturbio causaron que árboles cercanos afectaran líneas principales de transmisión eléctrica que dejaron sin servicio a medio millón de clientes de la Autoridad, es decir, aproximadamente a más de millón y medio de personas. Esto fue un acontecimiento que no se pudo evitar ni prevenir. Cuatro (4) centros judiciales de las zona norte y el propio Tribunal Supremo tuvieron que, para todos los propósitos prácticos, suspender sus labores. No les fue posible realizar trabajos análogos a los de los letrados, en los casos ante nuestra consideración, se vieron imposibilitados de llevar a cabo.

No estamos ante un hecho aislado que afectara únicamente a las partes y para el cual debieron haber tenido un plan de contingencia, una alternativa. No fue falta de diligencia, ni el dejar las cosas para última hora lo que les impidió cumplir con los términos fijados por ley.

■■■■ Las peticionarias tenían treinta (30) días jurisdiccionales para presentar sus recursos. Esto lo hubieran podido hacer si no hubiese sido por el imprevisto acontecimiento de la interrupción masiva del servicio eléctrico en prácticamente toda la zona norte de la isla. Es claro que bajo estas circunstancias son de aplicación los preceptos de equidad del Art. 1058 del Código Civil, *supra*, que eximen de responsabilidad, en estos casos, del cumplimiento de los términos dispuestos en la Sec. 4.7 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2177. Reiteradamente hemos resuelto que en nuestro derecho permean los principios de equidad, buena fe y razonabilidad. El derecho es razonable y no exige lo que resulta imposible de cumplir.

■■■ Además, no debemos olvidar que "[l]a discreción permite salirse un tanto de la Ley en busca de la justicia" —*Pueblo v. Sánchez González*, 90 D.P.R. 197, 200 (1964)—

y que su "adecuado ejercicio ... está inexorable e indefectiblemente atado al concepto de razonabilidad" (énfasis suprimido), *Pueblo v. Ortega Santiago*, 125 D.P.R. 203, 211 (1990).

Por las razones antes expuestas, disponemos que bajo las circunstancias específicas de estos casos, en los que se interpuso un acontecimiento de fuerza mayor al cumplimiento de las obligaciones procesales por parte de los peticionarios, son de aplicación las normas de equidad establecidas en el Art. 1058 del Código Civil. El término jurisdiccional para presentar los recursos vencía el 8, no el 7 de septiembre de 2000. Por lo tanto, *resolvemos que este Tribunal tiene jurisdicción para considerar si, en los méritos, estos recursos deben ser expedidos.*

*Se dicta sentencia de conformidad.*

El Juez Asociado Señor Corrada Del Río disintió por entender que este Tribunal carece de jurisdicción. El Juez Asociado Señor Rebollo López no interviene. El Juez Asociado Señor Fuster Berlingeri no intervino.